Good morning, Your Honors. Mark Grossman for Petitioner. Mr. Smiley, I'm joined by my consultant Dr. Miller. This case arises out of the denial of Mr. Smiley's parole for the tenth time. Mr. Smiley's commitment offense was committed when he was 17 years old and intoxicated at a bar when a fight broke out between him and his friends and another individual who was a member of a rival mobility group. Mr. Smiley was charged with first and second degree murder and though one of his co-defendants alleged that Mr. Smiley also stabbed the victim, Mr. Smiley has through this day always denied that. Mr. Smiley was acquitted of first degree murder and he was convicted of second degree murder on an aiding and abetting theory as to which there was not a requisite finding that he committed the stabbing. Mr. Smiley has now been incarcerated for 28 years. Flowing from Mr. Smiley's liberty interest in his parole date comes certain due process rights. The question arises, what are the due process protections that his liberty interest gives him a right to? The Attorney General urges that we should look at the procedural due process rights that were afforded in a Nebraska case, but the mandate of the U.S. Supreme Court, as found by this court in Biggs, in Sass, and most recently in Irons, is that you look at the statutory scheme of the state to determine what protections are necessary. In this case, the statutory scheme, California Penal Code 34, uses language such as shall and unless. He shall be given a date unless he poses an unreasonable risk of danger to the community. So the due process rights, the Attorney General argues that the some evidence standard should be adopted. Some evidence of what? And I would submit that it needs to be some evidence that has some nexus to the statutory scheme. The statutory scheme both provides that he shall be released unless he poses an unreasonable risk, and the statutory scheme in California further has regulations which set the time for each offense. In this case, the time for a second-degree murder was 15 years to life, and the time for the more aggravated charge that he was acquitted of was 25 years to life. So he's been eligible since about 1990? He's been eligible since about 1990. That's correct, Your Honor. The two things it seems to me, I've tried to read and reread the report from the State of California, and there's a brief mention at the beginning about being a threat, and then there's no more mention tying that to the discussion, and it seems the discussion focuses on two things. One, his prior crime, and two, that he had a little bit of a rocky start at the beginning, but now he's had eight years, and depending on if you discount the non-violent signing of the papers for the family, it's how many? Fifteen years of I guess what you'd say a clean record. So my question really is this. The state's findings, how do you fit that analysis in? Is that some evidence, or is it not, and what do we do with discretion and input? Help me out. What you need to do is, and the courts already make this assessment in Irons. I believe that in Irons the court was referring to a future case like this. I'm going to quote from the court's decision. So in all of the prior cases, in Sims, in McQuillan, which dealt with the revocation of parole, which dealt with the revocation of parole, which dealt with the revocation of parole, in Sass, in Irons, all of those inmates had not served their minimum term. In this case, he's not only served the minimum term, but he has served well beyond the minimum term. In fact, he served beyond the term for the more aggravated sentence. To rely on the unchangeable factors of the commitment offense, which can't change, not only ignores the statutory scheme, which has regulations that prescribe what a sufficient amount of time is, but it also ignores that there's no logical nexus. The due process requirements require a finding that either he hasn't served enough time or that he poses an unreasonable danger. The State's evidence, the State's forensic experts have repeatedly assessed his risk at low to moderately low. In fact, he's well below. He poses no, that's not entirely true, counsel. The psychiatrist's report, the psychological assessment, at one, went through a number of different measures. And on, I'm looking at page 20 of the report, concluded on, based on his history, that he was actually a high risk for violence. Which he then qualifies by saying that that number ought to be a little bit lower. But her assessment, based on his past history, is high risk for violence. She then goes through the clinical presentation and the management of future risk and concludes on one is low and no one is low to moderate. And her bottom line conclusion is high to low, which is on page 23. Depending on which measure you use, we seem to come up with different answers as to what his risk for violence is. I don't believe that the Attorney General has argued that he poses a, that the report is different than, I don't have the report in front of me. But I would certainly concede that if the forensic assessment was that he poses a high risk of violence, that I would not be here. I don't believe that's the fact. I'm looking at ER 122. I'm quoting from the report. Based on the above information, it appears that Mr. Smiley presented, now I've got, unfortunately I have a very bad copy, so I'm actually missing letters in here because of the copy machine, presented something at high risk for violence, which she then qualifies in a bolded and underlined statement that suggests that because of his history over the past eight years, maybe that ought to be downgraded and ought to be lower. But her conclusion based on that is high risk. And her bottom line conclusion of the last page, which is on ER page 125, is that he is a high to low likelihood of becoming involved in violence if released into the free community. Your Honor, addressing your comments, the qualification is the key to this. When he says high risk, he's saying, when I say high risk, I'm referring to the historic measure, which will never change. To the extent that you can use, and the court, the California Supreme Court in the Rosenkrantz decision, and I believe the Irons Court similarly held, that if you use the commitment offense as a basis, that might have some rationale. Well, it does have some rationale to the extent that the commitment offense could be a particularly egregious second degree murder. There could be facts of the commitment offense that when tied into some current assessment, for instance, if his offense was alcohol related and he still had an alcohol problem, there could be a nexus there. But to use the bare commitment offense, that can't ever change. And that was not the basis. As I read this report, the psychologist went through a fairly lengthy history of all of the prior reports. On Mr. Smiley, she went through detailed summaries of his childhood, of his, not only of this crime, but his incidents in prison in order to reach this profile. The profile suggests that there's a wide range here of risk. And it looks like things are running in Mr. Smiley's direction, but the question is whether the board of the BPT in California had some basis for concluding that Mr. Smiley needed additional time. I would like to address that, Your Honor, and I think that the argument is even more applicable to the second reason cited by the board, which was his escalating pattern of violence. And the board refers to him getting expelled from the third grade for fighting. Now, we need to note that his escalating pattern of violence culminated with a murder for second degree conviction for an offense that occurred when he was 17 years old. Now, in his concurring opinion in the Rosencrantz noted, and this is really the crux of the matter, that, and this is the 2002 Rosencrantz decision, that if you're going to use the commitment offense or, as Your Honor suggests, something even prior to the commitment offense, as cited by the board, his pattern of escalating violence, if you're going to use something that occurred prior to the sentence or the commitment offense itself, that has some rationale up to the point that he hasn't served in excess of the maximum term. In this case, he's already served in excess of the term prescribed for the more egregious offense. So the rationale for declaring it was 15 to life. That's correct, Your Honor. Well, then he's satisfied at least the minimum, but he hasn't served in excess of his sentence. Your Honor, under the statutory scheme, in order to, this provides that in order to not use those sentencing guidelines, there needs to be some connection to the timing of the offense or the gravity of the offense. There is nothing, there is nothing in the board's decision, there is nothing that would, that suggests that there's anything about, in fact, the gravity of his offense, it's not an egregious second-degree murder. If this argument could be made, that because of the offense or factors that occurred before the offense, that that constitutes some evidence, then not only, then what you've done is you've ignored the statutory scheme, which doesn't say that. Nobody would ever get out. And that's exactly what's happening here. And since he was denied in 2004, he's been denied three more times. If you look at the 2004 comments, it seems to suggest, well, you've done everything right, but we just want you to have a little more time. Come back in a year. He's come back three more times, no disciplinary violations, he's continued to be denied. He has served more than twice the sentence that he, that was contemplated. Your time has expired. Why don't we hear from the State, thank you. Good morning. Good morning. May it please the Court, my name is Collette Cavalier, and I'm a Deputy Attorney General for the State of California, appearing on behalf of Respondent Apelli Warden Hernandez. Mr. Smiley claims that the Board of Parole hearings should have found him suitable for parole and that the failure to do so violates his due process rights. But the State court decisions denying these claims was not contrary to or an unreasonable application of any clearly established Federal law. Accordingly, he's simply not entitled to Federal habeas relief. Let me ask this, do you agree that the standard which has been established is that there must be some evidence of continued risk? Incess, this court has held that a Board of Parole hearings decision denying parole must be supported by some evidence, but there is no clearly established Supreme Court authority which so holds, which extends the some evidence standard to the parole suitability context. But I guess what the Supreme Court cases have held that where there is a liberty interest, you have to give due process, is that right? Yes, and under Greenholz, the Supreme Court says that those due process protections include only an opportunity to be heard and a statement of reasons for the denial. And it clearly says that the Constitution does not require more. In fact, they go on to distinguish between parole, revocation, and disciplinary decisions which are very fact-based and require some evidence and say that parole suitability decisions, the parole authority need not cite to specific evidence in the record to support his decision based on the more subjective and predictive nature. Here's my problem with that. I guess you could never, under that theory, you would never get relief under EDCA for one of these, correct? Because as long as they had some document that gave some reason, that's all you'd need. And that would meet, because then nothing would be contrary to Supreme Court law? At this point, there is no Supreme Court authority that requires more. But here, the State court... No, but why don't we stick with my question? Is there any way you could get relief under EDCA for a parole decision of the State based on your construct of it? If they were able to show that they were not provided the due process protections required under Greenholz, then they would be able to be entitled to relief. But as long as they got a hearing and a piece of paper that says you're denied, that's all you need. Yes. However, this is not that case. This case, the State courts applied State law and found that there was more than some evidence to support the State court's decision. There's some evidence. There's some evidence was the facts of the crime, Smiley's criminal history, and his 16-year history of misconduct while in prison. Mr. Smiley claims that this is a case like in Biggs and Irons where the court suggested that the crime, the denial of parole was based on the commitment offense alone. But here, the board specifically found that Smiley committed serious misconduct while in prison within the code of regulations, Title 15, Section 2402C. He established an awful disciplinary record, as Smiley concedes, amassing 30 disciplinary infractions between 1980 and 1996. But how long has his record been clean? At the time of the hearing, which was in 2004, he had 8 years of discipline-free time compared to 16 years of misconduct time or bad. And one of those, but the watermark in 1996 was saying the wrong thing on a family visit application. It was not a violence issue. It was not a violence, but there are several violent offenses noted in those 30 disciplinary infractions. And how long had he been free of any violent conduct in prison? I'm not sure what the last violence was. Footnote 2 in the magistrate's report and recommendation sets forth all 30 of the disciplinary infractions for which he was convicted. The most serious was a four-and-a-half-year SHU term, security housing unit term, for assault on another inmate. He was also found guilty of setting fires, throwing caustic liquid on correctional officers, drug use, inciting others to disobey rules, and possession of contraband while in prison. His current record shows him really as a model prisoner, participating in educational and vocational programs and doing art so that there can be some charity involved also. The psychologist says Smiley is probably as ready as he will ever be for parole. Yes, Your Honor. And the board considered that and specifically commended him for his achievements and noted that he was on the right track, but simply that his recent positive program and relatively short period of discipline-free time was outweighed by his violent history prior to incarceration and for the first 16 years of his incarceration. Now, how much time do you think the parole board thinks is necessary? He's now 45, the crime was when he was 17, and he's had well in excess of eight years of nonviolent and complete cooperation with authorities. Where does he go from here? I think that's within the discretion of the parole board, Your Honor. There are a couple of California cases, the Elkins case and the Lee case, where the California court said that under similar records, eventually you just have to give him parole and to overturn the board. Your Honor, Elkins and Lee, both like the court noted in Irons, this court noted in Irons and in Sass, those were inmates with exemplary conduct records. This is not an inmate with an exemplary conduct record. And although he's on the right track, the board clearly had some evidence to conclude that he was not yet suitable for parole and that there was some risk that he would pose a risk of danger to society if released. Counsel, is it the state's position that Mr. Smiley does have a liberty interest here? There seems to be some back and forth between our cases and the Supreme Court's case in Dannenberg. Yes, Your Honor, there is some tension there. In Dannenberg, the court noted that the inmate could be held for the maximum term as long as the crime was found to be particularly egregious and that there was no right to be found suitable for parole until the board concluded that he would not pose a risk of danger. Okay. In light of that, what is the state's position? I have two questions. One, what is the state's position in the abstract about whether there is a liberty interest here that is subject to the due process clause? And second, what is the state's interpretation of what our cases have said about whether there's liberty interest? First of all, I'd like to know what the state thinks about the statute and the Supreme Court's decision in Dannenberg. Your Honor, our position is that there is no clearly established federal authority. No, that's not what I asked. I want to know what California thinks about California's statute. Our position is that there is no liberty interest because the statute creates merely an expectation of parole but does not create an entitlement to parole. Okay. Okay. So your interpretation of Dannenberg is that Dannenberg means when the court says there's no mandatory language here, so there's no liberty interest. Yes, Your Honor. Now, what is your understanding of what our court has said in Sass, Biggs and Irons? Sass, Biggs and Irons have cited to this Court's decision in McQuillian, which was a parole rescission case, and found that the language of Section 3041 does create a liberty interest in parole. However, we would submit that that is not clearly established federal law for parole. No, and not clearly established federal law doesn't have too much to do with it now because this panel is we are governed by our prior decision. So I want to know what the state's construction of Sass and Irons is. Sass, Biggs and Irons have held that there is a clearly established. Okay. So you think that this panel is probably bound to follow that and find that there is a liberty interest for which there is a due process right that attaches? Yes. Okay. Looking at the Dannenberg case, actually it was addressing a narrower question, which was the entitlement to proportionality review. I think that's really the issue that was before Dannenberg. So it's not really, I think, inconsistent with our Court's holding about liberty interest. Do you agree with that? Not entirely, Your Honor. I do agree that that was the primary focus of Dannenberg, but the Court in Dannenberg clearly said that the inmate is simply not entitled to be released until he's found suitable. The question of whether he is entitled to a proportional term under the matrix simply cannot come into a question because he must first be found suitable for parole, and there is no mandatory language requiring the Board to do that. Thank you. Thank you. You may have a minute for rebuttal. Nebraska, the finding in Green-Holtz, the limited procedural rights, don't apply here. That was the application. Green-Holtz said that you look at the statute to determine what the liberty interest is. Counsel, if we're looking for a Supreme Court case that is just clearly on point and that compels reversal here, what case is it? It's Green-Holtz, and it would be the Board v. Allen. And those are the cases that the Ninth Circuit Board v. Allen. And those are the cases that this Court has relied on in determining that California inmates do have a protected liberty interest. Now, counsel argues that here there surely is some evidence that he poses some risk. Well, under the law, under the statutory scheme, that's not enough. The some evidence has to be that he currently poses an unreasonable risk. And I would argue that to whatever extent you could say that the needle moves because he did something bad long ago, well, that's true. That's why the historical risk is high, based on the immutable factor. But I would argue that the needle doesn't move at all when asking the question of does he currently pose an unreasonable risk. And I would argue that if you allow the needle to be moved, if you allow the some evidence of a current unreasonable risk, if you allow that scale to be tipped by the commitment offense, then you have taken this person who has committed not an agreed to second-degree murder, who was acquitted of first-degree murder, and who has a liberty interest and a parole date, and you have given them life without the possibility of parole. Thank you. Thank both counsel for your arguments. The case of Smiley v. Hernandez is submitted.
judges: B. Fletcher, McKeown, Bybee